

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PATRICIA NILSEN, et al.,

　　　　　　　Plaintiffs,

　　v.

UNIVERSITY OF WASHINGTON
MEDICAL CENTER, et al.,

　　　　　　　Defendants.

CASE NO. C23-1498 MJP

ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT

This matter comes before the Court on Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 95) and Defendants' Motion for Partial Summary Judgment (Dkt. No. 56). Having reviewed the Motions, the Responses (Dkt. Nos. 120, 123), and Replies (Dkt. Nos. 124, 128), and all supporting materials, and having held oral argument on October 29, 2024, the Court DENIES Plaintiffs' Motion and GRANTS Defendants' Motion.

**BACKGROUND**

The twenty-one Plaintiffs in this lawsuit are former employees of the University of Washington who were terminated after the University did not accommodate their religious

1    objections to the University's Covid-19 vaccination requirement. Nineteen of the Plaintiffs were

2    healthcare workers at Harborview Medical Center or hospitals comprising the University of

3    Washington Medical Center, while Plaintiff Avery Snyder worked as a field engineer in the

4    Applied Physics Lab and Plaintiff Patricia Nilsen worked was a clinical instructor at the

5    University's School of Nursing. (See Declaration of Shelley Kostrinsky (Dkt. No. 70);

6    Declaration of James Girton (Dkt. No. 67).) Plaintiffs pursue a smattering of federal and state

7    law claims. The Parties have cross-moved for partial summary judgment on some, but not all of

8    the claims. Below, the Court reviews Washington State Governor's 2021 vaccine mandate, the

9    University's implementation Governor's vaccination mandate, the evidence relevant to the

10   claims and defenses at issue in the cross motions, and the procedural posture.

11   **A.    The Governor's Mandate**

12           After Covid-19 vaccines were approved and in wide use, Governor Jay Inslee signed a

13   proclamation that mandated all healthcare workers and state employees to be vaccinated or

14   receive a medical or religious exemption by October 18, 2021. (Ex. C to the Declaration of

15   Timothy O'Connell (Dkt. No. 57-1 at 17-30) ("Proclamation" or "Mandate").) The Proclamation

16   was in partial response to the emergence of the "delta variant" of Covid-19 that was "highly

17   contagious." (Id. at 18.) The Proclamation stated that "COVID-19 vaccines are effective in

18   reducing infection and serious disease, widespread vaccination is the primary means we have as

19   a state to protect everyone[.]" (Id. at 19.) And, among other things, the Proclamation identified

20   "the duty of every employer to protect the health and safety of employees by establishing and

21   maintaining a healthy and safe work environment and by requiring all employees to comply with

22   health and safety measures." (Id. at 20.)

23

24

1    The Proclamation also included a provision allowing for exemptions to the vaccine

2  mandate. Specifically, it provided:

3      In implementing the requirements of this Order, State Agencies, operators of Educational
       Settings, and operators of Health Care Settings:

4

5          Must provide any disability-related reasonable accommodations and sincerely
           held religious belief accommodations to the requirements of this Order that are
6          required under the Americans with Disabilities Act of 1990 (ADA), the
           Rehabilitation Act of 1973 (Rehabilitation Act), Title VII of the Civil Rights Act
           of 1964 (Title VII), the Washington Law Against Discrimination (WLAD), and
7          any other applicable law. As provided in the above-noted laws, State Agencies,
           operators of Educational Settings, and operators of Health Care Settings are not
8          required to provide accommodations if they would cause undue hardship.

9  (O'Connell Decl. Ex. C, Dkt. No. 57-1 at 22.) The Proclamation further specified that "[a]s

10  provided in the above noted laws, State Agencies, operators of Educational Settings, and

11  operators of Health Care Settings are not required to provide accommodations if they would

12  cause undue hardship." (Id. at 5-6.)

13  **B.    The University's Policy**

14    In response to the Mandate, the University created a set of guidelines for exemptions and

15  accommodations, which the Court refers to as the "Policy." (Ex. D to the Declaration of Nathan

16  Arnold ISO Def. MPSJ ("Second Arnold Decl.") (Dkt. No. 122-4).) The Policy included

17  guidelines specific to employees who provided direct or indirect "patient care in medical centers,

18  clinics & other health care settings." (Id.) For those employees with direct or indirect patient

19  contact, the Policy recommended different accommodations for those with medical exemptions

20  and those with religious exemptions. For "the small group of [employees] who have a University

21  approved medical exemptions," the Policy placed those employees "into a 'temporary deferred

22  vaccination' status pending availability of new COVID vaccine products that could be used" and

23  allowed for accommodation. (Dkt. No. 122-4 at 2-3, 8.) For those employees with religious

24

1    exemptions, the Policy recommended against accommodation. (Id. at 2-3.) The Policy explained

2    that because "sincerely held religious beliefs are considered permanent and would not change

3    based on the availability of future vaccine products," an "indefinite" accommodation would

4    "present an undue hardship and a barrier to safe patient care." (Id. at 2-3.)

5        The University's Medical Exemption Review Panel's ("Panel") developed the Policy to

6    implement the Governor's Mandate. (Declaration of Seth Cohen, M.D. ¶ 13 (Dkt. No. 59).) The

7    Panel, composed of six medical doctors and other nurse leaders from UW Medicine, drew "a

8    distinction between temporary and permanent accommodations." (Id. ¶ 15.) Medical exemptions

9    were considered temporary with "the expectation [] that the employee would become vaccinated

10   against COVID-19 after the temporary medical condition resolved." (Id.) For example, if an

11   employee was allergic to a vaccine component, the Panel believed that future vaccines might not

12   include the allergenic component. (Id.) Religious exemptions were considered permanent

13   because religious views against vaccines were not expected to change, even as components of

14   the vaccines themselves might have evolved. (Id.) The Panel also viewed those with medical and

15   religious exemptions as posing distinct risks. According to Cohen, "[t]emporary

16   accommodations involve substantially less disruption and fewer safety concerns because the

17   employee is required to become vaccinated after the medical condition or contraindication

18   resolves." (Id.) But "allowing healthcare workers to continue to remain on-site and provide direct

19   and indirect patient care while permanently unvaccinated would increase the health and safety

20   risk at the University and lead to a less safe environment for its patients, visitors, and

21   employees." (Id.)

22

23

24

1    **C.    The University's Accommodation Process**

2        Plaintiffs rely extensively on a document that they claim shows the number of people at

3    the University who were given medical and religious exemptions and, of those, how many were

4    given accommodations. (Exhibit F to the Declaration of Nathan Arnold ¶ 8 (Dkt. No. 48) ("First

5    Arnold Decl.").) The document appears to show that: (1) 61 employees sought medical

6    exemptions; (2) 23 obtained exemptions; and (3) all 23 of those individuals obtained

7    accommodations. (Ex. F to the Arnold Decl. (Dkt. No. 48-6 at 4).) The document identifies a

8    "job profile," "job title," "organization," and location of each individual, but none of the data

9    fields identifies whether or not these individuals had direct or indirect patient contact or worked

10   in close quarters with others. The document also appears to show that: (1) 370 employees sought

11   religious exemptions; (2) 366 had were given exemptions; and (3) 141 were given

12   accommodations. (Id. at 15.) As with the medical exemptees, the data includes information about

13   each employee's job profile, title, location, and organization, but nothing further about their

14   contact with patients or other employees.

15       Defendants object to the Court's consideration of this document for several reasons. First,

16   Defendants note that Plaintiffs withdrew the document and asked that it be stricken. This is

17   correct. (See Stipulated Motion to Strike (Dkt. No. 50) (asking the Court to strike Dkt. Nos. 42-

18   48); Order Granting Stipulated Motion (Dkt. No. 51).) Second, Defendants point out that

19   counsel's declaration inaccurately states that the document was produced in discovery, when it

20   was actually obtained through a public records request. (See Declaration of Nathan Arnold Decl.

21   ¶ 8 (Dkt. No. 48) ("First Arnold Decl.").) Third, Defendants argue that there are substantial

22   questions about the authenticity and admissibility of the document and Plaintiffs point to no one

23   who can or has testified as to what the document is and what it describes.

24

1    **D.     Termination Process of Plaintiffs**

2          Each of the twenty-one Plaintiffs applied for an exemption to the vaccination Mandate

3    and an accommodation under the Policy. Although each was given an exemption, none of the

4    Plaintiffs was accommodated. Each Plaintiff was terminated because their job duties required

5    direct or indirect patient contact or close contacts with other employees and their religious

6    exemptions could not be permanently accommodated. The Court reviews the two broad

7    categories into which Plaintiffs fit—(1) direct patient contact; and (2) indirect patient contact—

8    as well as the two outliers—Plaintiff Nilsen and Plaintiff Snyder.

9          **1.     Direct Patient Contact Group**

10         The first group of Plaintiffs are those whose job duties required at least some direct

11   patient care. Defendants claim this includes Plaintiffs Bolas, Earl-Patopea, Ford, Galanga,

12   Gibson, Groller, Hughes, Jansen, Mathias, Pokorny, Rhodes, Sandi, Sivakanthan, Sizer, Slish,

13   and Torres. Of these, only Mathias, Pokorny, and Rhodes dispute the assertion. As the Court

14   explains below, the facts do not bear out their arguments.

15         First, notwithstanding Plaintiffs' briefing, Mathias admitted in her deposition that she had

16   some direct patient contact. (Mathias Dep. at 25, 29, 32-34, 51, 57 (Declaration of Timothy

17   O'Connell Ex. BB) (Dkt. No. 57-1 at 248-292).) This is consistent with Mathias' response to a

18   Request for Admission, where she admitted that she had "direct and in person contact with

19   patients in [her] position as a Registered Nurse at UWMC in 2020 and 2021." (Declaration of

20   Timothy O'Connell Ex. P. (Dkt. No. 57-1 at 140).) This is also consistent with Mathias' job

21   duties as a Registered Nurse 2. (Schell Decl. Ex. R (Dkt. No. 58-1 at 75-77).) It is thus

22   undisputed Mathias had some direct patient contact as part of her job.

23

24

1    Second, contrary to Plaintiffs' briefing, Pokorny's job required some direct contact and

2    she had consistent indirect contact. Pokorny was an in-patient pharmacists who worked for the

3    University for twenty-three years. (Declaration of Kathleen Pokorny ¶ 3 (Dkt. No. 110).)

4    Pokorny had to assemble medications for "Code Blue" events, where lifesaving medication is

5    needed for a patient. Pokorny argues that she had been excused from Code Blue work as of

6    January 2021 because of a left foot injury. (Id. ¶¶ 13-14.) But as Defendants point out, Code

7    Blue events did require Pokorny to hand the medication to the person administering it, showing

8    some direct patient contact. (Pokorny Dep. 24-26 (O'Connell Decl. Ex. CC).) Pokorny's job also

9    required her to provide patient education at bedside, which she did once during the pandemic.

10   (Pokorny Decl. ¶ 15.) Although Pokorny claims she could have done this remotely, it does not

11   refute the fact she had still direct patient contact. Pokorny also provided testimony that she had

12   indirect patient contact due to her contacts with other staff during her shifts, including those

13   working in the operating room that was across the hall from the pharmacy. (Pokorny Dep. at 19-

14   20, 22, 32-33.)

15   Third, the evidence shows that Rhodes had some direct and indirect patient contact.

16   Rhodes argues that she did not have indirect patient contact and that she could have performed

17   her work by phone. In support, Rhodes cites to her supervisor's declaration who proposed to

18   accommodate her to work remotely since Rhodes had "very little face-to-face patient care."

19   (Declaration of Megan Fuller ¶¶ 16, 18 (Dkt. No. 117).) But Rhodes testified that in a "rare

20   instance where there was no medical assistants to assist the physician," she would perform their

21   work, which included taking a patient's vitals, discussing medications, and discharging the

22   patient. (Dep. of Christen Rhodes at 29-30.) This is consistent with Rhodes' uncontested job

23   description, which includes direct patient contact. (See Declaration of Kathy Schell Decl. ¶ 31 &

24

Ex. V (RN 2 job duties) (Dkt. No. 58-1 at 92-94); Rhodes Dep. at 17 (confirming the job description accurately described her duties as an "RN 2").) And Rhodes has admitted she had to regularly interact with clinical staff who worked with patients. (Declaration of Christen Rhodes ¶ 14 (Dkt. No. 111).)

### 2.    Indirect Patient Contact

The second group of Plaintiffs are those whose job duties required at least some indirect patient contact. Defendants claim that this includes Bigea, Legaspi, and Lopez. Although Bigea disputes the assertion, the facts do not bear out her position. Bigea avers that she did not have in-person patient contact (Declaration of Petra Bigea ¶ 8 (Dkt. No. 98).) But Bigea testified that her job required her to have some contact with other patient providers in her duty of collecting and delivering medical records from doctor and workstations. (Dep. of Petra Bigea at 36-40, 43-44, 50 (O'Connell Decl. Ex. EE).) And Bigea also "agreed" that she "had indirect patient contact." (Id. at 139.)

### 3.    Plaintiff Nilsen

Plaintiff Patricia Nelson was a clinical instructor at the University of Washington's School of Nursing. (Kostrinsky Decl. ¶ 13; Declaration of Patricia Nilsen ¶ 11 (Dkt. No. 109).) When she taught, she had direct patient contact in a clinical setting and indirect patient contact while teaching on-site. (Id. ¶ 12.) This is consistent with Nilsen's admission that she had "Direct Patient Contact and Indirect Patient Contact with patients in your position as an Obstetrics and Gynecology Clinical Faculty Member at the University of Washington's School of Nursing in 2020 and 2021." (O'Connell Decl. Ex. Q (Dkt. No. 57-1 at 149) (capitalization in original).)

#### 4.    Plaintiff Snyder

Plaintiff Avery Snyder was a Field Engineer II at the Applied Physics Lab (APL), whose job duties required travel at sea on research vessels. (Declaration of James Girton ¶¶ 5, 7 (Dkt. No. 67).) Although Snyder disputes the amount of time he spent at sea, it remains uncontested that his job duties required some travel at sea on small vessels with other employees in close quarters. (See Declaration of Avery Snyder ¶¶ 28-29 (Dkt. No. 115).)

#### 5.    Accommodation and Termination Process

Plaintiffs were terminated after a review by the University concluded that they could not be accommodated without an undue burden. Plaintiffs name two University employees who were Human Resource managers—Kathy Schell and Jennifer Petritz—involved in the termination process for most, but not all of the Plaintiffs. Below, the Court reviews the facts relevant to the accommodation and termination process.

Defendant Kathy Schell is UW Medicine's Human Resource Manager who details the accommodation and termination process that applied to most of the Plaintiffs. (Schell Decl. (Dkt. No. 58).) As Schell explains, she made an "individualized analysis of whether the employee could be reasonably accommodated without posing an undue burden on HMC and UWMC" by "review[ing] the employee's position, job duties, and work environment, including an assessment of whether there are mitigating measures that could be taken to reduce identified workplace risks based on consultation with the University's Infection Prevention and Employee Health committee (Employee Health)." (Id. ¶ 6.) Schell "also considered HMC and UWMC needs and the burden that would be placed on HMC and UWMC, including the diminished safety of the hospitals' employees, patients, and visitors." (Id.) Schell avers that Plaintiffs Bolas, Earl-Patopea, Ford, Galanga, Jansen, Sandi, Mathias, Pokorny, Rhodes, Sivakanthan, Sizer,

1    Torres, Gibson, Groller, Hughes, and Slish could not be accommodated due to their direct patient

2    contact. (Id. ¶¶ 49-50.) And as to Lopez, Bigea, and Legaspi, Schell states that they could not be

3    accommodated due to their indirect patient contact. (Id. ¶¶ 51-52.) Schell states that her

4    involvement in the termination of these nineteen employees was "done in the regular course of

5    [her] duties" and that she was "following and implementing the policies and directives of UW

6    Medicine and the University as [she] understood them." (Id. ¶ 59.) She also disclaims any anti-

7    religious animosity. (Id.)

8            Defendant Jennifer Petritz is the UW's Human Resources Director who was also

9    involved in the termination of Plaintiff Rhodes. (See FAC ¶¶ 330-33; Declaration of Jennifer

10   Petritz ¶ 3 (Dkt. No. 61).) Petritz avers that she implemented "the policies and directives of UW

11   Medicine and the University as [she] understood them" and that her participation in the Rhodes'

12   termination did not reflect any animosity against her religious beliefs and that she gained nothing

13   from it. (Declaration of Jennifer Petritz ¶ 3 (Dkt. No. 61).)

14           The Court notes that Plaintiffs have not named any individual involved in the termination

15   of Plaintiffs Nilsen or Snyder.

16   **E.      Plaintiffs' Claims**

17           Plaintiffs have alleged sixteen causes of action in their untidy, 138-page complaint. The

18   claims are as follows: (1) violations of Washington Law Against Discrimination (WLAD), as to

19   a perceived disability; (2) violations of Washington's Constitutional right of privacy; (3)

20   violations of Due Process, actionable under 42 U.S.C. § 1983; (4) violations of Equal Protection,

21   actionable under 42 U.S.C. § 1983; (5) violations of Washington's anti-wage theft laws; (6)

22   breach of contract; (7) failure to accommodate under WLAD; (8) disparate impact under WLAD;

23   (9) violations of the First Amendment of the United States Constitution; (10) arbitrary and

24

1   capricious conduct in violation of state law; (11) violations of public policy; (12) violations of

2   the takings clauses of the U.S. and Washington State Constitutions; (13) illegal investigational

3   drug use, actionable under 42 U.S.C. § 1983; (14) unconstitutional conditions, actionable under

4   42 U.S.C. § 1983; (15) retaliation and wrongful termination in violation of WLAD; and (16)

5   unlawful discrimination under WLAD and Title VII.

6   **F.    Cross-Motions for Partial Summary Judgment**

7          Through their Motion, Plaintiffs move for relief on their First Amendment claim (the

8   ninth cause of action), stating that this "is the focus of th[eir] motion for partial summary

9   judgment" (Mot. at 11.) In just over a page, they also suggest the Court should grant relief on

10  their Equal Protection and Due Process claims. (id. at 21-23.)

11         Defendants seek summary judgment on Plaintiffs' first, third, fourth, seventh, eighth,

12  ninth, tenth, eleventh, thirteenth, fourteenth, and sixteenth causes of action. (Defs. MPSJ.) In

13  response to Defendants' Motion, Plaintiffs "dismiss" their claims against Defendant Kirsti

14  Aravena because she was "not a decision maker who implemented the [accommodation] policy."

15  (Resp. at 1.) Plaintiffs also "clarify that they seek no Title VII [r]elief" and that this "decides

16  Defendants' argument regarding" counts twelve, thirteen, and sixteen. (Id. at 1-2.) Plaintiffs

17  "dismiss Counts XII (Takings) and XIII (Investigational Drug Use." (Id.) Plaintiffs further state

18  that they "do not seek any Title VII statutory remedies." (Id. at 13.) But they argue that

19  "Defendants deprived them of their federal statutory Title VII rights, and that deprivation is

20  actionable pursuant to 42 U.S.C. [§] 1983." (Id.)

21         Based on these concessions, the Court notes that: (1) Plaintiffs are not pursuing claims

22  under Title VII; (2) Plaintiffs have dismissed their sixteenth cause of action for hostile work

23  environment; (3) Plaintiffs have dismissed their twelfth cause of action for illegal takings; (4)

24

1    Plaintiffs have dismissed their thirteenth cause of action for investigational drug use; and (5)

2    Plaintiffs have dismissed Aravena as a party. The Court also notes that neither Party has sought

3    relief as to the second, fifth, sixth, or fifteenth cause of action, all of which are state-law claims.

**ANALYSIS**

4

5    **A.    Legal Standard**

6            Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

7    file, and any affidavits show that there is no genuine issue as to any material fact and that the

8    movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

9    an issue of fact exists, the Court must view all evidence in the light most favorable to the

10   nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty

11   Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is

12   sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The

13   moving party bears the initial burden of showing that there is no evidence which supports an

14   element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

15   Once the movant has met this burden, the nonmoving party then must show that there is a

16   genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the

17   existence of a genuine issue of material fact, "the moving party is entitled to judgment as a

18   matter of law." Celotex, 477 U.S. at 323-24.

19   **B.    Plaintiffs' Section 1983 Claims**

20           Defendants argue that Plaintiffs cannot pursue Section 1983 claims against any of the

21   Defendants. While the Court agrees in part, it finds that nineteen of the twenty-one Plaintiffs

22   may pursue claims for monetary damages against Petritz and Schell in their personal capacity.

23

24

1    The Court reviews the various issues and flaws in Plaintiffs' complaint and certain of

2    Defendants' arguments.

3    **1.    Claims Against the University**

4        A party asserting federal constitutional violations against the government must bring suit

5    under 42 U.S.C. § 1983. See Azul-Pacifico, Inc. v. City of Los Angeles, 973 F.2d 704, 705 (9th

6    Cir. 1992). As Defendants correctly point out, no claims can be brought against the University,

7    as it is a subdivision of the State, immune from suit. As the Supreme Court has made clear, "a

8    State is not a person within the meaning of § 1983." Will v. Mich Dep't of State Police, 491 U.S.

9    58, 64 (1989). As such, the § 1983 claims against the University must be dismissed.

10        At oral argument, Plaintiffs suggested for the very first time that the University is not a

11    state agency entitled to sovereign immunity, citing Kohn v. State Bar of California, 87 F.4th

12    1021, 1031 (9th Cir. 2023) (en banc). Plaintiffs could have, but failed to raise this theory in

13    opposition to Defendants' Motion and by failing to do so, they waived the argument. Even if the

14    Court were to reach the issue, the Court finds ample support for all three factors of the Kohn test,

15    as is outlined in Defendants' Surreply. (Dkt. No. 141.)

16    **2.    Claims against Petritz and Schell in their Official Capacity**

17        Defendants are correct that Plaintiffs cannot sue Petritz or Schell in their official

18    capacities. First, Plaintiffs cannot pursue claims for monetary damages against Petritz and Schell

19    in their official capacity because such a claim is considered "a suit against the official's office

20    . . . [that] is no different from a suit against the State itself"—barred by sovereign immunity.

21    Will, 491 U.S. at 71. Plaintiffs' claims for monetary damages against Petritz and Schell cannot

22    proceed. Second, because Plaintiffs expressly sued Petritz and Schell only in their personal

23    capacities, they cannot pursue any claims for prospective injunctive relief against them in their

24

1   official capacities. See id. at 71 n.10 (noting that official capacity suits for prospective injunctive

2   relief can be pursued). Plaintiffs went to great lengths to allege that Petritz and Schell each acted

3   "in her personal capacity outside the scope of her duties as an employee of UWMC with the

4   intent to discriminate" and that each was "neither doing her job nor acting in her official

5   capacity." (FAC ¶¶ 190, 193, 332, 337.) By making these express allegations, Plaintiffs cannot

6   now argue in the summary judgment briefing that they are suing Schell and Petritz in their

7   official capacities. Even if they had, Plaintiffs could not have pursued such a claim because they

8   did not allege "an ongoing violation of federal law [to be] properly characterized as prospective."

9   Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland, 535 U.S. 635, 645 (2002). Plaintiffs

10  cannot pursue any claims against Petritz or Schell in their official capacities.

11          **3.      Claims against Petritz and Schell in their Personal Capacity**

12          Defendants argue that Plaintiffs cannot sue Petritz and Schell in their personal capacities

13  because they were "acting in their capacity as state employees, carrying out their employer's

14  efforts to implement the Proclamation." (Mot. at 22.) Defendants' argument presents a

15  fundamental misunderstanding of § 1983 claims, and it lacks merit.

16          The elements of a § 1983 claim are (1) the action the action was committed by a person

17  acting "under color of state law" and (2) the action resulted in the deprivation of a constitutional

18  right or federal statutory right. Ochoa v. Pub. Consulting Grp., Inc., 48 F.4th 1102, 1107 (9th Cir.

19  2022) (quoting West v. Atkins, 487 U.S. 42, 48 (1988)). Generally, "a public employee acts

20  under color of state law while acting in his official capacity or while exercising his

21  responsibilities pursuant to state law." Paeste v. Gov't of Guam, 798 F.3d 1228, 1238 (9th Cir.

22  2015) (quoting West, 487 U.S. at 50). In order to be individually liable under § 1983, an

23

24

1    individual must personally participate in an alleged rights deprivation. Avalos v. Baca, 596 F.3d

2    583, 587 (9th Cir. 2010).

3        Here, it is uncontroverted that Schell and Petritz were acting under color of state law

4    when they applied the University's vaccination Policy as HR managers. They are properly

5    named in their personal capacities for acting under color of state law as to nineteen of the

6    twenty-one Plaintiffs. Defendants appear to confuse the question of respondeat superior with the

7    concept of personal capacity suits, arguing that a person cannot be sued individually if they were

8    acting in their capacity as "a state employee[], carrying out their employer's" wishes. (Mot. at

9    22.) But the fact that a state employee was doing his or her job simply shows that they were

10    acting under color of state law—an essential element of a § 1983 claim. If the Court were to

11    accept Defendants' argument, then no individual could be sued in their personal capacity under §

12    1983. This result cannot stand, and the Court rejects Defendants' argument.

13        Lastly, the Court notes that neither Plaintiff Nilsen nor Snyder has sued any individual

14    involved in their termination. Having failed to name an individual potentially liable under § 1983

15    claims, the Court GRANTS summary judgment in Defendants' favor as to Snyder's and Nilsen's

16    § 1983 claims.

17    **4.    No § 1983 Claims Premised on Violations of Title VII**

18        Plaintiffs argue that "Defendants deprived them of their federal statutory Title VII rights,

19    and that deprivation is actionable pursuant to 42 U.S.C. [§] 1983." (Resp. at 13.) But as the Ninth

20    Circuit has explained, a "[v]iolation of rights created by Title VII cannot form the basis of

21    section 1983 claims." Learned v. City of Bellevue, 860 F.2d 928, 933 (9th Cir. 1988). The Court

22    therefore GRANTS summary judgment in Defendants' favor as to all of Plaintiffs' Title VII

23

24

1  claims, given Plaintiffs other concession that they "do not seek any Title VII statutory remedies."

2  (Resp. at 13.)

3        **5.    Viable § 1983 Claims**

4        In summary, the Court construes Plaintiffs' § 1983 claims against Schell and Petritz in

5  their personal capacities for monetary damages only. This excludes Snyder and Nilsen, who

6  cannot pursue § 1983 claims. The § 1983 claims are premised on: (1) violations of the First

7  Amendment; (2) violations of Due Process; and (3) violations of Equal Protection (the ninth,

8  fourteenth, third, and fourth causes of action, respectively).

9  **C.    Plaintiffs Are Not Entitled to Summary Judgment on their First Amendment Claim**

10        Plaintiffs allege that the Schell and Petritz violated their First Amendment right to free

11  exercise by denying them an accommodation. After reviewing the applicable standards, the

12  Court concludes that the University's policy did not offend the First Amendment.

13        **1.    Legal Standard**

14        The Free Exercise Clause of the First Amendment provides that "Congress shall make no

15  law . . . prohibiting the free exercise" of religion. U.S. CONST. amend. I. In assessing a Free

16  Exercise claim, the Court must first determine what level of scrutiny to apply. Rational basis

17  review applies to neutral laws of general applicability, while strict scrutiny applies to those

18  which are not neutral and/or which are not generally applicable. See Fellowship of Christian

19  Athletes v. San Jose Unified Sch. Dist. Bd. of Educ., 82 F.4th 664, 685-86 (9th Cir. 2023).

20  "Supreme Court authority sets forth three bedrock requirements of the Free Exercise Clause that

21  the government may not transgress, absent a showing that satisfies strict scrutiny." Fellowship,

22  82 F.4th at 686. "First, a purportedly neutral 'generally applicable' policy may not have 'a

23  mechanism for individualized exemptions.'" Id. (quoting Fulton v. City of Philadelphia,

24

1  Pennsylvania, 593 U.S. 522, 533 (2021) (quotation omitted). "Second, the government may not

2  'treat . . . comparable secular activity more favorably than religious exercise." Id. (quoting

3  Tandon v. Newsom, 593 U.S. 61, 62 (2021)). "Third, the government may not act in a manner

4  'hostile to . . . religious beliefs' or inconsistent with the Free Exercise Clause's bar on even

5  'subtle departures from neutrality.'" Id. (quoting Masterpiece Cakeshop v. Colorado C.R.

6  Comm'n, 584 U.S. 617, 638 (2018) (citation omitted); citing Church of Lukumi Babalu Aye, Inc.

7  v. City of Hialeah., 508 U.S. 520, 534 (1993)). "The failure to meet any one of these

8  requirements subjects a governmental regulation to review under strict scrutiny." Id.

9      For government action to withstand strict scrutiny, the government must demonstrate that

10  "a law restrictive of religious practice must advance interests of the highest order and must be

11  narrowly tailored in pursuit of those interests." Lukumi, 508 U.S. at 546 (cleaned up). A state

12  action "is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil'

13  it seeks to remedy." Victory Processing, LLC v. Fox, 937 F.3d 1218, 1227–28 (9th Cir. 2019)

14  (quoting Frisby v. Schultz, 487 U.S. 474, 485 (1988)). "If a less restrictive alternative would

15  serve the state's compelling interest with the same level of effectiveness, the state must use that

16  alternative." Id. "Put another way, so long as the government can achieve its interests in a

17  manner that does not burden religion, it must do so." Fulton, 593 U.S. at 541.

18      But "[u]nder rational basis review, we must uphold the rules if they are rationally related

19  to a legitimate governmental purpose." Stormans, Inc. v. Wiesman, 794 F.3d 1064, 1084 (9th

20  Cir. 2015). Under rational basis review, Plaintiffs "have the burden to negat[e] every conceivable

21  basis which might support [the rules]." FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993)

22  (internal quotation marks omitted).

23

24

1    Below, the Court reviews the three "bedrock" principles and finds that the Policy does

2  not trigger strict scrutiny.

3    **b.    The University's Policy Does Not Trigger Strict Scrutiny**

4    The Court agrees with Defendants that under the first "bedrock" principle, the

5  University's Policy remains "generally applicable" even though it contained an individualized

6  accommodation process.

7    As the Supreme Court explained in <u>Fulton</u>, "[a] law is not generally applicable if it

8  invites the government to consider the particular reasons for a person's conduct by providing a

9  mechanism for individualized exemptions." <u>Fulton</u>, 593 U.S. at 533 (cleaned up). The Court in

10  <u>Fulton</u> highlighted the problematic fact that the city commissioner had the "sole discretion" to

11  determine whether to grant foster care providers a religious exemption without any objective

12  criteria. <u>Id.</u> at 535, 536 (concluding "that the inclusion of a formal system of entirely

13  discretionary exceptions . . . renders the contractual non-discrimination requirement not

14  generally applicable"). The Court also highlighted two examples where strict scrutiny applied to

15  individualized exemptions that turned on an undefined "good cause" standard. <u>Id.</u> (citing <u>Emp.</u>

16  <u>Div., Dep't of Hum. Res. of Oregon v. Smith</u>, 494 U.S. 872, 884 (1990); and <u>Sherbert v. Verner</u>,

17  374 U.S. 398 (1963)). The Ninth Circuit has warned that <u>Fulton</u> should not be limited to

18  scenarios where the state had "'unfettered' discretion." <u>Fellowship</u>, 82 F.4th at 687. "Properly

19  interpreted, <u>Fulton</u> counsels that the mere existence of a discretionary mechanism to grant

20  exemptions can be sufficient to render a policy not generally applicable, regardless of the actual

21  exercise." <u>Id.</u> at 687–88.

22    The Court here finds that the Policy remains generally applicable because it did not allow

23  Schell or Petritz to make discretionary accommodation decisions. UW's Policy offered both

24  medical and religious exemptions to those who claimed them. Plaintiffs do not challenge that

component of the Policy, as each was given a religious exemption from the vaccine mandate.

Instead, they challenge the accommodation process, claiming it was discretionary and allowed

for discrimination. But the facts do not bear this out. As Schell explains, she made an

"individualized analysis of whether the employee could be reasonably accommodated without

posing an undue burden on HMC and UWMC" by "review[ing] the employee's position, job

duties, and work environment, including an assessment of whether there are mitigating measures

that could be taken to reduce identified workplace risks based on consultation with the

University's Infection Prevention and Employee Health committee (Employee Health)." (Schell

Decl. ¶ 6.) Schell "also considered HMC and UWMC needs and the burden that would be placed

on HMC and UWMC, including the diminished safety of the hospitals' employees, patients, and

visitors." (Id.) These are sufficiently delineated and objective criteria that do not evidence any

discretion that would "'invite' the government to decide which reasons for not complying with

the policy are worthy of solicitude." Fulton, 593 U.S. at 533 (quoting Smith, 494 U.S. at 884);

see We The Patriots USA, Inc. v. Hochul, 17 F.4th 266, 288 (2d Cir.), opinion clarified, 17 F.4th

368 (2d Cir. 2021); Stormans, 794 F.3d at 1081–82 (finding that the challenged "rules do not

afford unfettered discretion that could lead to religious discrimination because the provisions are

tied to particularized, objective criteria"). The Policy remains generally applicable, and it does

not trigger strict scrutiny.

### c.    The Policy's Treatment of Secular Employees

Considering the second "bedrock" principle, the Court finds the Policy does not favor

secular employees over religious employees.

First, as to the exemption process, it was open to all employees there is no distinction

between religious and secular employees. Indeed, Plaintiffs make no complaint about the

exemption process itself, as each Plaintiffs was given a religious exemption.

1      Second, the Policy's accommodation process did not treat secular employees more

2 favorably than similarly-situated religious employees. Although the Policy treated religious

3 employees differently as to accommodations, it clearly identified that religious and secular

4 employees with direct or indirect patient contact were not similarly-situated. The University's

5 Panel drew a principled "distinction between temporary and permanent accommodations,"

6 noting the different risks that these employees presented insofar as accommodations. (Cohen

7 Decl. ¶ 15.) The Panel determined that those seeking a medical accommodation were both small

8 in number and the risk they posed was temporary. (Dkt. No. 48-4 at 2-3, 8.) This group of

9 employees differed from the larger cohort of individuals who sought a permanent religious

10 accommodations that presented a far greater risk "to safe patient care." (Id. 3-4.) Although the

11 Policy distinguished between medical and religious accommodations, the Court finds that the

12 Policy did not favor secular employees. "Comparability is concerned with the risks various

13 activities pose, not the reasons why people gather." Tandon, 593 U.S. at 62. Here, the Policy's

14 distinction between temporary and permanent accommodations reflected the fact that these two

15 groups posed unique risks. The relative size of each group and the duration of the

16 accommodation sought be each group highlights how they were not comparable from a risk

17 standpoint. In a similar context, the Ninth Circuit has held that medical objectors are not

18 necessarily "comparable" to religious objectors even in the same roles if the number of medical

19 exemptees are few. Doe v. San Diego Unified Sch. Dist., 19 F.4th 1173, 1178 (9th Cir. 2021)

20 (analyzing an injunction pending appeal). In Doe, the Ninth Circuit held that if the number of

21 persons seeking medical exemptions to a COVID vaccine mandate "is very small and the number

22 of students likely to seek a religious exemption is large, then the medical exemption would not

23 qualify as 'comparable' to the religious exemption in terms of the 'risk' each exemption poses to

24

1  the government's asserted interests." <u>Id.</u> While <u>Doe</u> considered an injunction pending appeal and

2  this issue is raised on summary judgment, its reasoning stands. Here, the record shows that the

3  Policy addressed the "small group of [healthcare personnel] who have a University medical

4  exemption. This demonstrates that the two groups of employees were not comparable, and the

5  Policy's distinction does not trigger strict scrutiny.

6         This conclusion remains consistent with a recent Ninth Circuit opinion that found

7  Spokane's implementation of a purportedly neutral vaccination policy improperly favored

8  secular firefighters. <u>Bacon v. Woodward</u>, 104 F.4th 744, 751 (9th Cir. 2024) (reversing a Rule 12

9  dismissal). In <u>Bacon</u>, the Court explained that "Spokane implemented a vaccine policy from

10  which it exempted certain firefighters based on a secular criterion—being a member of a

11  neighboring department—while holding firefighters who objected to vaccination on purely

12  religious grounds to a higher standard." <u>Id.</u> In <u>Bacon</u>, the two groups were comparable because

13  both groups were firefighters with no distinctions apparent on the face the complaint. Here,

14  unlike the interchangeable firefighters in <u>Bacon</u>, those with temporary medical exemptions have

15  not been shown to be comparable to those seeking permanent religious accommodations.

16         The Court also notes that Plaintiffs have failed to provide admissible data showing that

17  religious employees were treated less favorably than secular employees. The sole evidence

18  Plaintiffs present is a document that Plaintiffs' counsel has misrepresented as being provided by

19  Defendants in discovery. Even if counsel properly represented the source of the document,

20  Plaintiffs have not authenticated the document or shown that it is admissible evidence for any of

21  the points on which Plaintiffs invoke it. There is no testimony or declaration from a person with

22  knowledge as to its contents. And Plaintiffs themselves voluntarily struck the document from the

23

24

1    record, rendering it outside the Court's purview. For all of these reasons, the Court finds that

2    there is no admissible evidence before it showing any disparate treatment of religious employees.

3          **2.**      **Hostility to Religion**

4          Considering the third "bedrock" principle, the Court finds no hostility to religion that

5    might trigger strict scrutiny.

6          As the Ninth Circuit has explained, "the government may not act in a manner 'hostile to

7    . . . religious beliefs' or inconsistent with the Free Exercise Clause's bar on even 'subtle

8    departures from neutrality.'" Fellowship, 82 F.4th at 686 (quoting Masterpiece Cakeshop, 584

9    U.S. at 638 (citation omitted); citing Lukumi, 508 U.S. at 534). Here, Plaintiffs have not

10   provided any evidence of non-neutrality. Plaintiffs rely principally on an email from Katia Harb,

11   a senior director of the Environmental Health and Safety Department. But her email merely

12   reflects the Policy's distinction between temporary and permanent accommodations in the

13   direct/indirect patient contact roles. It does not evidence any hostility to religion—it merely

14   shows the University's reasonable distinction between the risks posed by the distinct requests for

15   temporary and permanent accommodations. Plaintiffs also rely on a declaration from a former

16   University professor who claims his religious objection was accommodated because he brought

17   in grant money. (Mot. at 16.) But the actual declaration provides no support to Plaintiffs'

18   assertion. The declarant states that "[w]hile I do not know why I was accommodated and others

19   were not, I suspect my academic credentials and the money I raised in grants for the University,

20   which was in excess of $1 million, might have contributed." (Declaration of Brian Johnson ¶ 14

21   (Dkt. No. 47).) This former professor's suppositions are not evidence of discrimination. Absent

22   is any admissible evidence that might trigger strict scrutiny under this principle.

23

24

### 3. The Policy Satisfies Rational Basis Review

Because the Policy does not trigger strict scrutiny, the Court must instead determine whether it is "rationally related to a legitimate governmental purpose." Stormans, 794 F.3d at 1084 (9th Cir. 2015). Here, the Policy's accommodation procedure was rationally related to the University's goal of protecting patient and employee safety, which Plaintiffs conceded at oral argument is a compelling governmental interest. And Plaintiffs have not met their "burden to negat[e] every conceivable basis which might support [the Policy]." FCC, 508 U.S. at 315 (internal quotation marks omitted). Finding that Policy satisfies Constitutional scrutiny, the Court DENIES Plaintiffs' Moton on this claim.

### D. Schell and Petritz Are Entitled to Qualified Immunity on the § 1983 Claims

The Court finds that Shell and Petritz are entitled to qualified immunity on all of Plaintiffs' § 1983 claims.

"The doctrine of qualified immunity protects government officials from liability for civil damages. . . ." Wood v. Moss, 572 U.S. 744, 757 (2014). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). "Whether qualified immunity can be invoked turns on the 'objective legal reasonableness' of the official's acts. And reasonableness of official action, in turn, must be 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.'" Ziglar v. Abbasi, 582 U.S. 120, 151 (alteration in original) (internal citation omitted) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982); Anderson v. Creighton, 483 U.S. 635, 639 (1987)).

First, the Court finds that Schell and Petritz are entitled to qualified immunity on the First Amendment claim presented in both the ninth and fourteenth causes of action. Because Schell and Petritz did not move for summary judgment on the merits of the First Amendment claim, the Court addresses qualified immunity even though it would normally not do so. See D.C. v. Wesby, 583 U.S. 48, 62 n.7 (2018) ("We continue to stress that lower courts should think hard, and then think hard again, before addressing both qualified immunity and the merits of an underlying constitutional claim." (cleaned up)). As the Court has concluded above, the Policy itself passes rational basis review. And there is no evidence that either Schell or Petritz violated any clearly established law by enforcing the Policy and not accommodating the nineteen Plaintiffs' accommodation requests. Even if the Policy had to meet strict scrutiny, Plaintiffs have not identified any clearly established law that would have put either Schell or Petritz on notice that the Policy's distinction between temporary and permanent accommodations was not the least restrictive, narrowly tailored means of satisfying the compelling state interest. Plaintiffs argue that Schell and Petritz violated clearly established law by forcing them to accept medication. But the case Plaintiffs cite—Health Freedom Defense Fund, Inc. v. Carvalho, 104 F.4th 715 (9th Cir. 2024)—was decided after the actions at issue in this case and it does not evidence clearly-established law that the Policy violated clearly-established law. The Court therefore GRANTS summary judgment to Petritz and Schell as to the First Amendment claims (the ninth and fourteenth causes of action) on the basis of qualified immunity.

Second, as to Due Process and Equal Protection claims, Plaintiffs fail to identify any response to Defendants' Motion. Having failed to identify any clearly-established law, Plaintiffs have failed to meet their burden. The Court finds that Petritz and Schell are entitled to qualified immunity, and the Court GRANTS summary judgment in their favor on the Due Process and

1  Equal Protection claims. The Court also declines to the consider the merits of these claims that

2  Plaintiffs very passingly identified in their Motion and which would fail for the reason of

3  qualified immunity. See Wesby, 583 U.S. at 62 n.7.

4  **E.    Plaintiffs' WLAD Claims Fail**

5      Defendants are entitled to summary judgment in their favor as to their undue burden

6  affirmative defense to Plaintiffs' WLAD claims on which they moved for relief.

7      Under the WLAD, "[w]hen considering an 'undue hardship' analysis, a court must

8  consider whether the defendant employer has sufficiently shown that the burden of granting an

9  accommodation would result in substantial increased costs in relation to the conduct of its

10 particular business." Suarez v. State, __ Wn.3d __, 552 P.3d 786, 799 (2024) (citing Groff v.

11 DeJoy, 600 U.S. 447, 469 (2023)). The court should look at all relevant factors in the case,

12 "including the particular accommodations at issue and their practical impact in light of the

13 nature, 'size and operating cost of [an] employer.'" Id. (quoting Groff, 600 U.S. at 470-71

14 (alteration in original)). "It would not be enough to simply conclude that a suggested

15 accommodation would cause an undue hardship, an employer would have to consider other

16 possible options." Id. "Courts should resolve whether a hardship would be substantial in the

17 context of an employer's business in the commonsense manner that it would use in applying any

18 such test." Id. Additionally, "[a]n accommodation that required the violation of governmental

19 mandate would cause an employer an 'undue hardship.'" Id. And "[a]n accommodation that

20 creates unreasonable safety risks, regardless of economic costs, also presents an 'undue hardship'

21 for an employer." Id. Equally, "[a]n accommodation that creates an 'undue hardship' on

22 coworkers also presents an 'undue hardship' for an employer." Id.

23

24

1    Defendants have shown convincing and uncontroverted evidence that accommodating

2    those with religious exemptions would have posed an undue hardship to the University by

3    diminishing the safety of its employees, patients, and visitors. Defendants rely, in part, on Dr.

4    Cohen, who explains why accommodating permanent religious objectors would have interfered

5    with the University's ability to ensure patient safety. Defendants also rely on Dr. Arthur

6    Reingold's expert opinion that "studies whose results were available in 2021, have

7    overwhelmingly demonstrated that receipt of a COVID-19 vaccine is associated with a reduced

8    risk of infection with and transmission of SARS-CoV-2 to others in diverse settings, including in

9    households and prisons and among healthcare workers." (Reingold Report ¶ 8 (Dkt. No. 71-1 at

10   9-10).) He also explains that those who are vaccinated and have breakthrough infections are still

11   less likely to transmit the virus to others. (Id. at 10.) The Ninth Circuit has considered similar

12   evidence and recognized it as a valid safety that establishes an undue hardship. Bhatia v.

13   Chevron U.S.A., Inc., 734 F.2d 1382, 1384 (9th Cir. 1984) (per curiam); Doe, 19 F.4th at 1180.

14   The Court finds this evidence sufficient to sustain the undue hardship defense.

15   Plaintiffs fail to raise a dispute of fact on this point. Plaintiffs rely on Dr. Harvey Risch,

16   who mostly identifies ways the University could have taken greater safety measures without a

17   vaccine mandate. But Dr. Risch does not opine that vaccines were ineffective safety measures.

18   Instead, he claims that the University failed to consider that post-infection natural immunity was

19   as or more protective than vaccination and that "[t]o my understanding, two doses of the Covid-

20   19 vaccines in general use in the latter half of 2021 did not substantially reduce risk of infection

21   transmission." (Risch Report at 4-5.) Dr. Risch further states his belief that breakthrough

22   infections still occurred with vaccinated people. (See id. at 9.) Accepting Dr. Risch's statements

23   as true, the Court does not find that they contradict or raise a dispute of fact that unvaccinated

24

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 26

1    employees with direct and indirect patient and employee contacts posed no safety risk. This does

2    not contradict Defendants' evidence of an undue burden.

3       The Court therefore GRANTS Defendants' Motion as to the WLAD claims (the first,

4    seventh, and eighth causes of action), noting that Defendants did not move as to the WLAD

5    retaliation claim (the fifteenth cause of action).

6    **F. No Viable Public Policy Claim**

7       Plaintiffs claim Defendants wrongfully terminated them in violation of public policy. The

8    Court agrees that Defendants are entitled to summary judgment on this claim.

9       The tort for wrongful termination in violation of public policy is a narrow exception to

10   the at-will doctrine. Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 232 (1984). "It generally

11   applies in four specific scenarios: (1) where employees are fired for refusing to commit an illegal

12   act, (2) where employees are fired for performing a public duty or obligation, (3) where

13   employees are fired for exercising a legal right or privilege, and (4) where employees are fired in

14   retaliation for reporting employer misconduct." Suarez, 552 P.2d at 801 (citing Dicomes v. State,

15   113 Wn.2d 612, 618 (1989)). "If the claim fits neatly within one of these scenarios, in order to

16   prevail on the cause of action, the plaintiff employee must demonstrate that their termination

17   may have been motivated by reasons that contravene a clear mandate of public policy." Id.

18   (citing Martin v. Gonzaga Univ., 191 Wn.2d 712, 723 (2018)). There are four elements to the

19   claim:

20      (1) the existence of a "clear public policy" (clarity element), (2) whether "discouraging
   the conduct in which [the employee] engaged would jeopardize the public policy"
21      (jeopardy element), (3) whether the "public-policy-linked conduct caused the dismissal"
   (causation element), and (4) whether the employer is "able to offer an overriding
22      justification for the dismissal" (absence of justification element).

23   Rose v. Anderson Hay & Grain Co., 184 Wn.2d 268, 277 (2015) (alteration in original).

24

1    Here, Plaintiffs assert that their terminations violated public policy protecting "free

2    exercise of religion and medical and bodily autonomy." (Resp. at 18.) But given the Court's

3    analysis as to the undue burden of accommodating Plaintiffs, the Court finds that the University

4    had an overriding justification for its termination of Plaintiffs' employment. The University

5    reasonably identified an appropriate justification—avoiding the adverse risk of allowing a large

6    number of unvaccinated employees to have long-term direct or indirect contact with patients and

7    co-workers. The Court therefore GRANTS summary judgment in Defendants' favor as to this

8    claim.

9    **G.    No Viable Arbitrary and Capricious Claim**

10    Plaintiffs' arbitrary and capricious claim does not survive summary judgment.

11    "[T]he courts have inherent constitutional power to review "illegal or manifestly arbitrary

12    and capricious action violative of fundamental rights.'" Pierce Cnty. Sheriff v. Civ. Serv.

13    Comm'n of Pierce Cnty., 98 Wn.2d 690, 693 (1983) (quoting State ex rel. DuPont-Fort Lewis

14    Sch. Dist. 7 v. Bruno, 62 Wn.2d 790, 794 (1963)). "Arbitrary and capricious action has been

15    defined as willful and unreasoning action, without consideration and in disregard of facts and

16    circumstances." State v. Rowe, 93 Wn.2d 277, 284 (1980). "Where there is room for two

17    opinions, action is not arbitrary and capricious even though one may believe an erroneous

18    conclusion has been reached." Id. Moreover, "[t]he scope of court review should be very narrow,

19    however, and one who seeks to demonstrate that action is arbitrary and capricious must carry a

20    heavy burden." Pierce Cnty., 98 Wn.2d at 695.

21    Here, Plaintiffs have not met their heavy burden of showing that Defendants acted

22    arbitrarily or capriciously. The decision on accommodations was reasonable and designed to

23    protect patient and employee safety. At most, Plaintiffs identify a single competing opinion from

24

Dr. Risch, who believes there were other means of reducing transmission and that the vaccine was not the most effective means of providing safety. But Dr. Risch's opinion merely evidences room for dispute, not that Defendants acted arbitrarily or capriciously. The uncontroverted evidence shows the Panel engaged in a reasoned decision in creating the Policy and that accommodating a small cohort of temporary medical accommodations was not arbitrary or capricious. The Court GRANTS the Motion as to this claim and finds that Defendants are entitled to summary judgment on this claim.

**H.    The Court Declines Supplemental Jurisdiction**

The Court's decision today leaves only four state law claims to be litigated: the second, fifth, sixth, or fifteenth causes of action. The Court is otherwise without original jurisdiction over these claims, and could only continue to preside over this case by exercising supplemental jurisdiction under 28 U.S.C. § 1367(c). Under 28 US.C. § 1367(c)(2), the Court may decline to exercise supplemental jurisdiction if any of the four issues appear:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

The Court declines to exercise supplemental jurisdiction over the remaining state law claims. At oral argument, the Court asked the Parties to identify whether they believed the Court should retain supplemental jurisdiction over this matter if it dismissed the federal law claims that conferred original jurisdiction over the matter. Plaintiffs asked that the remaining state law claims be dismissed so that they could refile them in state court. Defendants asked the Court to retain jurisdiction given the amount of time the Court has invested and the few remaining claims

left to be litigated. Although the Court appreciates Defendants' point, it does not find the time it has invested in this matter warrants the exercise of supplemental jurisdiction. The Court has dismissed all of claims over which it has original jurisdiction and the remaining state law claims involve several potential novel or complex constitutional issues. These factors show that it would be imprudent to exercise supplemental jurisdiction. The Court therefore DECLINES to exercise supplemental jurisdiction and DISMISSES the second, fifth, sixth, and fifteenth causes of action without prejudice for lack of subject matter jurisdiction.

## CONCLUSION

Plaintiffs have not demonstrated any basis for relief on the three claims on which they moved for summary judgment. But the Court finds that Defendants are entitled to summary judgment on all of the claims identified in their Motion. Having granted summary judgment in Defendants' favor on all federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, which the Court DISMISSES without prejudice.

The clerk is ordered to provide copies of this order to all counsel.

Dated November 8, 2024.

Marsha J. Pechman
United States Senior District Judge